IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 5853 |
| v. | ) ) ) | Judge Mark Filip |
| EDWARD R. VELAZQUEZ, V-TEK TRADING GROUP, INC., V-TEK CAPITAL, INC. (IL), AND V-TEK CAPITAL INC. (BVI), | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER
ADOPTING THE RECOMMENDATION OF MAGISTRATE JUDGE MASON TO
ISSUE A RULE TO SHOW CAUSE AND PROVIDE A HEARING, IF APPROPRIATE**

Deborah L. Thorne, as Temporary Receiver ("Receiver") in the case, has filed a motion seeking a hearing and Rule to Show Cause (the "Motion") regarding why Edward R. Velazquez ("Mr. Velazquez") should not be held in contempt of court for potentially having violated the asset freeze imposed on him by order of the Court dated September 13, 2004. (D.E. 229.)[1] The Receiver claims that Mr. Velazquez made several transfers involving motor vehicles after the freeze was imposed, in violation of the order. (*Id.* at 2-7.) Magistrate Judge Mason submitted a Report and Recommendation ("Report") detailing various instances of Mr. Velazquez's potential misconduct and recommending that the District Court grant the Motion for Rule to Show Cause and related hearing in part. (D.E. 243.) Presently before the Court are Defendant Velazquez's objections to the Report. (D.E. 244.) For the reasons discussed below, the Court adopts the recommendations of Magistrate Judge Mason.

---

[1] Docket entries are designated as "D.E. ___," followed by the appropriate district court docket number.

I.   **Background**

The Commodity Futures Trading Commission ("CFTC") initiated this action in September 2004, after discovery of alleged improprieties in the operation of several entities owned by Mr. Velazquez, including V-Tek Trading Group, Inc. and V-Tek Capital, Inc. (D.E. 1.) On September 10, 2004, the District Court (Manning, J.) imposed a Statutory Restraining Order and Asset Freeze ("Freeze Order") on Mr. Velazquez. (D.E. 9 at 5-6.) It provided, in relevant part:

> Velazquez, V-Tek Trading Group, and V-Tek Capital, and Relief Defendants FX 500 and V-Tek Fund and all persons insofar as they are acting in the capacity of their agents, successors, assigns, and attorneys, and all persons insofar as they are acting in the active concert or participation with them who receive actual notice of such order by personal service or otherwise, shall be prohibited from directly or indirectly:
>
> A. Withdrawing, transferring, removing, dissipating or disposing funds, assets or other property, wherever situated . . .

(*Id.* at 5.) To enforce the Freeze Order, among other reasons, the Court appointed Deborah Thorne as Temporary Receiver on January 28, 2005. (*See* D.E. 94.) On October 18, 2005, the Receiver filed a Motion for Rule to Show Cause against Mr. Velazquez concerning various transfers of motor vehicles in potential violation of the Freeze Order. (D.E. 229.) The transfers involved (1) a 2003 Hummer ("2003 Hummer"), (2) a 2002 Dodge Viper ("Viper"), and (3) two Indian Chief Motorcycles and a second Hummer. (*Id.* at 2-7.) After considering the motion and Mr. Velazquez's response (D.E. 239), Magistrate Judge Michael Mason granted the Receiver's motion in part. (D.E. 243 at 3.) Judge Mason granted the motion with regard to the three transfers, but denied without prejudice the Receiver's motion for additional relief, including attorney's fees and costs, entry of an order requiring Mr. Velazquez to turn over proceeds of the

vehicle sales, and entry of an order requiring Mr. Velazquez to turn over any unsold vehicles to the Receiver. (*Id.*) In recommending that the Motion be granted, Magistrate Judge Mason made clear that he intended to have a hearing concerning the final disposition of the Motion. (*Id.*) (The Receiver confirmed this plan at a recent status hearing, at which it indicated that a hearing concerning the putative violations put at issue by the Motion can occur in July 2007, at which hearing both these putative violations and subsequent ongoing alleged violations will be explored. *Accord* D.E. 321 at 1.) Defendant timely filed objections to the Magistrate Judge's Report and Recommendation. (D.E. 244.)

## II. Standard of Review

The parties do not discuss whether the objections to Judge Mason's Report should be evaluated pursuant to Fed. R. Civ. P. 72(a), which concerns non-dispositive matters, or Fed. R. Civ. P. 72(b), which concerns dispositive motions and prisoner petitions. Obviously, the Motion to Issue a Rule to Show Cause why Mr. Velazquez should not be held in civil contempt is not a "prisoner petition." It also does not appear to be a dispositive motion. The idea of a show cause motion is to hold a hearing, at which the factfinder will ultimately evaluate whether a finding of contempt (or revocation of supervised release, etc.) is appropriate on the evidence and facts presented. In any event, because the Court would agree with Magistrate Judge Mason under either standard of review, the Court will not definitively resolve this issue, as the result would be the same in either event.

As to the issue of the propriety of issuing a rule to show cause, caselaw also is somewhat unclear as to who bears the burden of proof when a court considers a Motion for a Rule to Show Cause. *See, e.g., Bd. of Trustees of the Bricklayers Local 74 v. Michael A. Vorkapic, Inc.*, No. 01

C 1048, 2001 WL 649501, at *2 n. 2 (N.D. Ill. June 8, 2001) (noting that the court could not find circuit precedent regarding the appropriate burden in a rule to show cause proceeding in the civil contempt context). Ultimately, though, to prove civil contempt, the movant must provide clear and convincing evidence of the non-movant's misconduct. *See id.* at *2; *United States v. Berg*, 20 F.3d 304, 311 (7th Cir. 1994) ("Before a court can enter a finding of contempt for failure to follow a court order, the complaining party must prove, by clear and convincing evidence, that the person has not been reasonably diligent and energetic in attempting to accomplish what was ordered.") (internal quotation marks and citation omitted). However, at this juncture, the Court considers only whether Magistrate Judge Mason appropriately decided to proceed to a hearing at which Mr. Velazquez will be afforded an opportunity to show cause why he should not be held in contempt. The Receiver's burden—simply to establish the propriety of having a hearing—is therefore logically less demanding at this threshold stage. In this regard, the Court agrees with then-Magistrate Judge (now District Judge) Joan Gottschall, who stated that "[t]he factual determination that sets the [contempt] proceedings in motion is perhaps best described as a preliminary assessment that the facts presented implicate defendants in violation of the court's order." *Central States v. Transcon Lines*, No. 90 C 1853, 1993 U.S. Dist. LEXIS 12427, at *7 (N.D. Ill. Sept. 7, 1993). Mr. Velazquez has not yet been held in civil contempt; that determination is the purpose of the hearing that will be afforded to Mr. Velazquez (and also to the Receiver, of course).

### III. Discussion

#### A. The 2003 Hummer

The Receiver claims that Mr. Velazquez improperly transferred the proceeds of the sale

4

of the 2003 Hummer to his sister, Bianca. (D.E. 229 at 3.) Mr. Velazquez admits that "the evidence presented by the Receiver with respect to the 2003 Hummer is generally factually accurate." (D.E. 231 at 2.) That is, Mr. Velazquez admits that he bought a 2003 Hummer from Woodfield Hummer in February 2003, and that he sold the 2003 Hummer back to Woodfield in August 2004. (D.E. 231 at 2.) Woodfield repurchased the 2003 Hummer for $11,642.22. (*See* D.E. 229, Ex. C (check from Woodfield to Velazquez).) The check, dated October 25, 2004, was made payable to "V-Tek Capital/Edward Velazquez" and endorsed on the back, "Pay to the order of Bianca Velazquez." (*Id.*) The signature of Bianca Velazquez, Velazquez's sister, appears below the endorsement. (*Id.*) Bianca Velazquez deposited the check into her bank account at Glenview State Bank on October 27, 2004 (*Id.*, Ex. D), and withdrew the funds on October 30, 2004, and November 1, 2004. (*Id.*, Ex. E.) According to Mr. Velazquez at least, "[t]he proceeds of the check were used [by Bianca Velazquez] to make mortgage payments on [Mr. Velazquez's] condominium now seized by and in the possession of the Receiver." (D.E. 231 at 3.)

Mr. Velazquez admits that "the monies from that check should not have been used by his sister to make [the alleged] mortgage payments." (D.E. 231 at 3.) However, Mr. Velazquez suggests (seemingly through lawyer argument only, as he generally has pleaded the Fifth Amendment) that he did not endorse the check to Bianca Velazquez (D.E. 244 at 2) and that he was unaware of Bianca Velazquez's "activities" with regard to the check. (D.E. 231 at 3.) However, Mr. Velazquez offers no explanation as to why Bianca Velazquez otherwise would have cashed the check, affirmatively withdrawn the proceeds, and then used them to pay for *his* condominium. He also argues that Bianca Velazquez was unaware of the Freeze Order and was simply "acting on behalf of the defendant while he was out of the country." (*Id.* at 2.)

5

However, Bianca Velazquez's awareness of the Freeze Order would not appear to be necessary for a violation to have occurred. (*See* D.E. 9 at 5.) The Freeze Order prohibits "all persons insofar as they are acting in the capacity of [defendants'] agents" from "[w]ithdrawing, transferring, removing, dissipating or disposing of funds." (*Id.*) Even if Mr. Velazquez did not directly or indirectly cause or permit the transfer of the check to his sister (a proposition the Court doubts, as Velazquez has not provided any other explanation for how she came into possession of the check or why she would use its proceeds to pay for his real estate (*see* D.E. 229, Ex. C)), Bianca Velazquez admits she acted on Velazquez's behalf while he was out of the country. (D.E. 231 at 2.) Therefore, Bianca Velazquez's activities with regard to the proceeds of the 2003 Hummer—*i.e.*, signing the check, depositing and then withdrawing the funds, and supposedly making Mr. Velazquez's mortgage payments—are potentially impermissible because they could constitute a transfer and disposal of frozen assets by a person acting on Mr. Velazquez's behalf. Irrespective of whether an agent knows of the unlawfulness of his or her act, a principal who is subject to a legal duty or obligation (as Mr. Velazquez could be under the freeze order) cannot breech that legal duty or obligation through the contrivance of employing an unknowing agent or designee.

Two final points concerning this potential violation. Mr. Velazquez appears to suggest that the Magistrate Judge is required to accept the unsworn argument of his counsel concerning his state of mind. *See* D.E. 244 at 2 (contending that, "[t]he Magistrate Judge has ignored . . . that Mr. Velazquez was unaware of Bianca's use of the monies."). At the hearing on the Rule to Show Cause, Mr. Velazquez will be free to offer testimony about his state of mind; if he does, Magistrate Judge Mason can evaluate his credibility. However, he offers no authority for the

proposition that the Magistrate Judge is *required* to credit even that testimony, much less the unsworn argument of his counsel about Mr. Velazquez's supposed blameless state of mind. Similarly, Mr. Velazquez presumably will be free at any hearing to offer testimony of his sister, Bianca, whom Mr. Velazquez suggests has relevant testimony. That testimony, if offered, also can be evaluated by Magistrate Judge Mason for its credibility. However, again, Mr. Velazquez offers no authority for the proposition that Magistrate Judge Mason will then be required to credit such testimony. Mr. Velazquez also offers no authority for his seeming related assertion that his sister Bianca's barebones affidavit can preclude Magistrate Judge Mason even from holding a hearing on the Rule to Show Cause, where other evidence suggests that a violation may well have occurred. Mr. Velazquez will have a full and fair chance to introduce evidence at the forthcoming hearing, if he chooses, but he cannot pretermit that hearing through the cursory affidavit of his sister Bianca or his lawyer's unsworn argument about Mr. Velazquez's supposedly blameless state of mind. Finally, in this regard, the Court notes that it respectfully is suspect of Mr. Velazquez's seeming position that his sister can testify to his state of mind. Magistrate Judge Mason will rule on any evidentiary issues presented, but one can legitimately doubt Mr. Velazquez's seeming contention that his sister can competently attest to what he in fact knew.

**B.    The Viper**

Mr. Velazquez admits that he purchased a new 2002 Dodge Viper for $74,465.75 in August 2003. (D.E. 231 at 3.) Mr. Velazquez states that the vehicle was sold in February 2004, and he attaches certain exhibits to his Response to the Motion to support this contention. (*See id.*, Ex. 3 (affidavit of Velazquez's sister, Zully Velazquez, who states that she sold the Viper to

Steven MacIntyre in February 2004); *id.*, Ex. 4 (copy of a limited warranty executed on February 3, 2004 between Zully Velazquez and Steven McIntyre.).) However, as Magistrate Judge Mason noted, Mr. Velazquez does not attach a contract of sale for the vehicle. (D.E. 243 at 2 n.2.)

The Receiver challenges Mr. Velazquez's account. She alleges that Mr. Velazquez sold the Viper on September 2, 2005, nearly a year after the Freeze Order took effect. (D.E. 229 at 3.) In support of her contention, the Receiver attaches several documents to her Motion. First, she attaches title information reflecting that the Viper was sold by Mr. Velazquez on September 2, 2005—purportedly to Andy Pellos/All Antique Brokers. (*Id.*, Ex. G at 1-2.) Second, the Receiver attaches the Certificate of Title, issued by the Illinois Secretary of State and signed by Mr. Velazquez, which indicates that a lien held by DaimlerChrysler was released on August 29, 2005 and that the "date of sale" was September 2, 2005. (*Id.*, Ex. G at 3.) The Receiver also states that her research gives great pause as to whether "All Antique Brokers" actually exists or existed, and she also cannot locate any record of an "Andy Pellos." (D.E. 229 at 3-4.)

On "information and belief," Mr. Velazquez contends that Receiver's Exhibit G "represents the date, September 2, 2005, that a Mr. Andy Pelos [sic] recorded the title to a 2002 Dodge Viper," which Mr. Velazquez therefore "did not sell . . . after the freeze order." (D.E. 231 at 4.) However, Mr. Velazquez has not asserted that Receiver's Exhibit G refers to a different car (both the Warranty Mr. Velazquez furnishes and the Receiver's Exhibit G refer to a Dodge Viper with VIN #1B3ER69E62V100883), nor has he contested the title document's or his signature's authenticity. (*See id.* at 3-4; D.E. 244 at 2-3.) Because the documentation furnished by Receiver at least suggests that Mr. Velazquez sold the Viper on September 2, 2005, long after the Freeze Order took effect, the Court cannot see how it is improper to hold a hearing, and to

afford both sides a chance to offer any further competent evidence or argument, about whether the substantial documentary evidence suggesting a violation should ultimately be credited or not. At that hearing, Mr. Velazquez can offer live testimony from his other sister, Zully, who has offered another barebones affidavit. The Receiver also presumably can offer any other evidence, and likely would at least attempt to call Mr. Velazquez to testify. He is free to maintain his invocation of the Fifth Amendment, of course, with whatever evidentiary inferences are warranted and appropriate under the law and circumstances presented.

In any event, the essence of Mr. Velazquez's objection is that Magistrate Judge Mason has not conclusively credited the barebones affidavit of Mr. Velazquez's sister, Zully (*see* D.E. 244 at 2-3), in the face of substantial documentary evidence suggesting that the affidavit might not be correct or credible (*see* D.E. 248 at 4). There is certainly sufficient basis to proceed forward with a hearing on the Motion, which is what the Magistrate Judge has recommended.

### C.     The Motorcycles and the Second Hummer

The Receiver moves for a hearing and Rule to Show Cause regarding three vehicles—two Indian Chief motorcycles and a second Hummer—that she claims were sold in violation of the Freeze Order. (D.E. 229 at 4-7.) Mr. Velazquez admits that he owned the vehicles, but argues that he sold the Vehicles to Brian Berbaum in March 2004, before the freeze took effect. (D.E. 231 at 5.) Berbaum's deposition testimony is consistent with Mr. Velazquez's argument: Berbaum testified that he executed three contracts with Zully Velazquez for the purchase of the three vehicles in March 2004. (D.E. 229, Ex. H at 17.) Mr. Velazquez has also furnished a copy of a contract between Zully Velazquez and Brian Berbaum regarding one Indian Chief motorcycle (VIN # 5CDCNB516YG001581) dated March 8, 2004. (D.E. 231, Ex. 4 at 2-3.)

9

The Receiver again challenges Mr. Velazquez's account. First, she points out that Berbaum gave conflicting testimony regarding the purchase price of the Vehicles. (*See* D.E. 229 at 4-5; *id.*, Ex. H at 17, 115.) The Receiver also points out that Berbaum could not produce any bank records corroborating his account, specifically concerning any bank transactions concerning the substantial amounts of money that supposedly changed hands. (*Id.* at 5, Ex. I.)

The vehicles' Certificates of Title also undermine Mr. Velazquez and Berbaum's claims. (D.E. 229 at 7.) The Certificates for the 2000 Hummer and the two motorcycles (all of which were signed by Mr. Velazquez) indicate that Berbaum purchased the vehicles from Mr. Velazquez on May 5, 2005. (*Id.*, Ex. K, M, N.) Berbaum stated that these documents can be explained: he testified that he lost the original titles and asked Mr. Velazquez to apply for duplicates. (D.E. 244 at 3.) However, there is no indication on the application for titles that Berbaum was seeking "duplicate titles" rather than simply "titles." (*Id.*, Ex. K, M, N; D.E. 243 at 2-3.) According to these documents, title was transferred on May 5, 2005, after the Freeze Order went into effect. (*Id.*) Furthermore, Berbaum's account of the entire affair is at least somewhat called into question because of documents purporting to reflect that he later sold at least one of the motorcycles to the seemingly non-existent "All Antique Brokers" in August 2005 (D.E. 229, Ex. O), and the fact that while he avers that he sold the other motorcycle, the certificate of title for that motorcycle seemingly reflects no such sale.

Although Mr. Velazquez has provided some evidence for his version of events, the weight of the documentary evidence implicates Mr. Velazquez in what is at least a potential violation of the Freeze Order. It was certainly not wrong for Magistrate Judge Mason to decide to afford the parties a hearing concerning this aspect of the Motion. Again, at this hearing, Mr. Velazquez

presumably will be able to offer whatever witnesses he believes are credible, and he can offer testimony himself if he chooses. The Receiver presumably will be able to do the same, and also can seek to call Mr. Velazquez. Defendant has not shown, however, that Magistrate Judge Mason erred in electing to afford the parties a hearing on the Rule to Show Cause. Proceeding forward in the incremental fashion recommended by Judge Mason—*i.e.*, by affording the parties a chance for a hearing—is a prudent way to proceed. At the conclusion of that hearing, Judge Mason can, as he already indicated he would, then decide whether civil contempt findings are ultimately warranted and what sanctions, if any, are appropriate. *Accord* D.E. 243 at 3.

**IV.     Conclusion**

After conducting a de novo review of Magistrate Judge Mason's recommendations, the Court adopts those recommendations in full. The facts presented implicate Mr. Velazquez in potential violations of the Court's Freeze Order. The Receiver's Motion for a Rule to Show Cause regarding the 2003 Hummer, the Viper, and the second Hummer and Indian motorcycles, and for a related hearing, as appropriate, is therefore granted.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Date: June 6, 2007